UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE



FILED

2018 JAN -4 P 4: 12

U.S. DISTRICT COURT
EASTERN DIST. TENN.

_____ DEPT. CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 3:15-CR-27 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGES VARLAN/SHIRLEY |
| | ) | |
| LUCA SARTINI, | ) | |
| LUIGI PALMA, a.k.a. "Jimmy Palma," | ) | |
| BENJAMIN RODRIGUEZ | ) | |
| SYLVIA HOFSTETTER, | ) | |
| COURTNEY NEWMAN, | ) | |
| CYNTHIA CLEMONS, and | ) | |
| HOLLI WOMACK, a.k.a. "Holli Carmichael," | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD SUPERSEDING INDICTMENT

### General Allegations

At all times material to this Indictment:

### Background

1.     The discipline of pain management is an accepted and recognized medical sub-specialty practiced by physicians throughout the United States.   Legitimate and qualified pain medicine experts have specialized knowledge, education, training, and experience and utilize a multi-disciplinary approach.   Presently, the discipline of pain medicine is recognized by state regulatory boards as a sub-specialty of anesthesiology, physical medicine and rehabilitation, neurology, and psychiatry, which are recognized as primary specialties in the United States.

Fellowship training programs exist for the purpose of further education in the sub-specialty of pain medicine, making graduates eligible for board certification in pain medicine.

2.      The defendants, **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** **BENJAMIN RODRIGUEZ**, **SYLVIA HOFSTETTER**, along with Clyde Christopher Tipton, charged in another instrument, ran "clinics" where powerful narcotics were prescribed and/or dispensed outside the scope of professional practice and not for a legitimate medical purpose, commonly referred to as "pill mills." These pill mills ostensibly offered patients "pain management," but did little more than provide prescriptions for narcotics and other powerful drugs for people who requested or anticipated receiving the prescriptions. The prescriptions were primarily for large dosages of highly addictive and potentially deadly Schedule II and III Controlled Substances, which commonly were diverted and/or abused by drug traffickers and addicts. Individuals seeking such prescriptions would often travel long distances purporting to suffer from severe, chronic pain.

3.      Patients routinely arrived at pill mills in groups of people, even though many of the patients' associates did not have appointments that day. One of the reasons patients arrived in groups was that a significant number of patients were sponsored by drug ring leaders, that is, drug dealers who paid for the Pain Clinic visits and prescriptions in order to obtain all or part of the opioids and other narcotics prescribed to the purported pain patients. In return, drug addicted patients would receive from the sponsor a portion of prescribed narcotics for free.

4.      Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** **BENJAMIN RODRIGUEZ**, **SYLVIA HOFSTETTER**, along with Clyde Christopher Tipton, charged in another instrument, hired medical providers with DEA registration numbers, or

2

providers expected to obtain DEA numbers, which would allow the providers to prescribe Controlled Substances.

        a.      The term "DEA registration number" is a number assigned to a health care provider by the U.S. Drug Enforcement Administration allowing them to write prescriptions for controlled substances.

        5.      The Controlled Substances Act, Title 21, United States Code, Sections 801, et seq. (hereinafter CSA), and its implementing regulations, set forth which drugs and other substances are defined by law as "Controlled Substances." Those Controlled Substances are then assigned to one of five schedules – Schedule I, II, III, IV, or V – depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

        a.      The term "Schedule I" means the drug or other substance has no currently-accepted medical use and cannot be safely used even under medical supervision. No prescriptions may be written for Schedule I substances.

        b.      The term "Schedule II" means the drug or other substance has a high potential for abuse, the drug has a currently accepted medical use with severe restrictions, and abuse of the drug may lead to severe psychological or physical dependence. Certain Schedule II drugs or substances have a high potential for abuse and can be crushed and snorted, or dissolved and injected, to get an immediate high. This abuse can lead to addiction, overdose, and sometimes death.

        c.      The term "Schedule III" means the drug or other substance has a high potential for abuse, but less than the drugs or substances listed in Schedule II, the drug has a

3

currently accepted medical use with severe restrictions, and abuse of the drug may lead to severe psychological or physical dependence.

        d.     The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or substances in Schedule III, the drug has a currently accepted medical use in treatment, and abuse of the drug may lead to limited (relative to the drugs or substances in Schedule III) physical dependence or psychological dependence.

        6.     Title 21, Code of Federal Regulations, Section 1306.04(a) states that a valid prescription for a Controlled Substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the CSA (21 U.S.C. § 829) and the person knowingly filling such a prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to Controlled Substances.

        7.     Medical providers at the clinics owned and/or operated by defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, along with Clyde Christopher Tipton, charged in another instrument, regularly prescribed the following Schedule II Controlled Substances:

        a.     Oxycodone: The generic name for a highly addictive prescription analgesic. The use of oxycodone in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. It is classified as a Schedule II Controlled Substance, and is sold generically or under a variety of brand names, including Roxicodone, OxyContin, and Percocet. Its legitimate medical purpose is to treat severe pain.

b.        Immediate Release Oxycodone: A formulation of oxycodone that once ingested by the individual, is immediately available in the body and is meant to provide instant relief for sudden or breakthrough pain.

c.        Extended Release Oxycodone: A formulation of oxycodone meant to treat around the clock severe pain by providing a controlled release of oxycodone.

d.        Morphine: The generic name for a highly addictive prescription analgesic. The use of morphine in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. It is classified as a Schedule II Controlled Substance, and sold generically or under a variety of brand names. Its legitimate medical purpose is to treat severe pain.

e.        Oxymorphone: The generic name for a highly addictive prescription analgesic. The use of oxymorphone in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. It is classified as a Schedule II Controlled Substance, and is sold generically or under a variety of brand names, including Numorphan. Its legitimate medical purpose is to treat severe pain.

### The Defendants and Related Entities

8.        An opioid-based pain management clinic (Pain Clinic) means any facility whose business model centered on providing opioid-based prescriptions to patients for profit. The Urgent Care & Surgery Center Enterprise (UCSC enterprise) operated Pain Clinics in Florida and Tennessee. In reality, those Pain Clinics were pill mills.

9.        The UCSC Hollywood Clinic (Hollywood Clinic) was a Pain Clinic in Hollywood, Florida. From in or about April 2009 through in or about January 2011, medical providers at the Hollywood Clinic prescribed opioids and other controlled substances to

thousands of purported pain patients in exchange for grossly excessive fees. The Hollywood Clinic did not accept insurance for pain patients. The majority of the prescriptions were unreasonable and medically unnecessary. Patients were required to keep follow-up appointments every 28 days to continue receiving their prescription, but were provided 30-day prescriptions.

10.     The UCSC enterprise formed Urgent Care and Surgery Center – Knoxville, LLC as the LLC associated with the first UCSC Pain Clinic in Tennessee. The first UCSC Tennessee Pain Clinic opened in or about 2011. The Tennessee Pain Clinics were later renamed Comprehensive Healthcare Systems (CHCS), and were located in Lenoir City and Knoxville. From in or about March 2011 through in or about March 2015, medical providers at CHCS prescribed opioids and other controlled substances to thousands of purported pain patients in exchange for grossly excessive fees. CHCS did not accept insurance. The vast majority of the prescriptions were unreasonable and medically unnecessary. Patients were required to keep follow-up appointments every 28 days to continue receiving their prescriptions, but were provided 30-day prescriptions. Once the UCSC enterprise discovered that drug screening could be profitable in and of itself, providers at CHCS began ordering medically unnecessary qualitative and quantitative drug screens (Drug Screenings) for every patient every 28 days.

11.     East Knoxville Healthcare Services (EKHCS) operated a Pain Clinic in Knoxville, Tennessee. From in or about September 2013 through in or about March 2015, medical providers at EKHCS prescribed opioids and other controlled substances to thousands of purported pain patients in exchange for grossly excessive fees. EKHCS did not accept insurance. The vast majority of the prescriptions were unreasonable and medically unnecessary. Patients were required to keep follow-up appointments every 28 days to continue receiving their

prescriptions, but were given 30-day prescriptions. Once the UCSC enterprise discovered that drug screening could be profitable in and of itself, providers at EKHCS ordered medically unnecessary Drug Screenings for every patient every 28 days.

12. Sterling Laboratories (Sterling) was a Lab headquartered in or near Seattle, Washington. From in or about August 2013 through in or about March 2015, Sterling billed Medicare for laboratory services, including, but not limited to, Drug Screenings.

13. Genesis Marketing (Genesis) was a Tennessee corporation established in or about August 2013 and headquartered in Knoxville, Tennessee. Genesis purported to provide marketing services for Sterling. In fact, Genesis was a shell company created and used as a vehicle to generate cash for Clyde Christopher Tipton and Maynard Alvarez, (both charged in another instrument), and others.

14. Pinnacle Laboratory (Pinnacle) was a Tennessee corporation formed by Clyde Christopher Tipton, charged in another instrument, to process Drug Screenings for patients of CHCS and EKHCS who did not have health insurance. Pinnacle was subsidized by the commission payments Genesis received from Sterling. Pinnacle received over $685,000 from Genesis between in or about September 2013 and in or about February 2015.

15. LELF Global Healthcare (LELF) was a shell company owned or controlled by defendant **LUCA SARTINI** and another co-conspirator known to the Grand Jury, and was created to funnel kickbacks from Sterling through Genesis and ultimately to defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and to Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument.

16. Medfix, LLC (Medfix) was a Florida corporation established in or about December 2010 and headquartered in or near Miami, Florida. Medfix was a corporation created

7

by defendant **LUCA SARTINI** and a coconspirator known to the Grand Jury and used as a vehicle to launder proceeds for defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**.

17.     Defendant **LUCA SARTINI**, a resident of Miami, Florida, and Italy, held ownership interests in several of the corporations associated with owning and operating the various Florida and Tennessee UCSC Clinics.   Defendant **LUCA SARTINI** personally enriched himself with millions of dollars as a result of his ownership and operation of the various Florida and Tennessee clinics.

18.     Defendant **LUIGI PALMA, a.k.a. "Jimmy Palma,"** a resident of Miami, Florida, and Italy, held ownership interests in several of the corporations associated with owning and operating the various Florida and Tennessee UCSC Clinics.   Defendant **LUIGI PALMA, a.k.a. "Jimmy Palma,"** personally enriched himself with millions of dollars as a result of his ownership and operation of the various Florida and Tennessee clinics.

19.     Defendant **BENJAMIN RODRIGUEZ** a resident of Miami, Florida, held ownership interests in several of the corporations associated with owning and operating the various Florida and Tennessee UCSC Clinics.   Defendant **BENJAMIN RODRIGUEZ** personally enriched himself with millions of dollars as a result of his ownership and operation of the various Florida and Tennessee clinics.

20.     Defendant **SYLVIA HOFSTETTER**, a resident of Tennessee and Florida, administered and managed CHCS, and owned, administered and managed EKHCS, from in or about May 2011 through in or about March 2015.   Defendant **SYLVIA HOFSTETTER** personally enriched herself with millions of dollars as a result of her management,

administration, and ownership of those Pain Clinics. Before coming to Tennessee to operate new Pain Clinics, defendant **SYLVIA HOFSTETTER** worked at the Hollywood Clinic.

21. Defendant Alan Pecorella, charged in another instrument, a resident of Tennessee and New Jersey, was employed as a physician assistant at CHCS and EKHCS from in or about January 2013 through in or about August 2013. Defendant Alan Pecorella, charged in another instrument, prescribed hundreds of thousands of opioid pain killers and other narcotics to thousands of patients at CHCS and EKHCS outside the scope of professional practice and without a legitimate medical purpose.

22. Defendant Theodore McCrary, charged in another instrument, a resident of Tennessee, was employed as a physician assistant at CHCS and EKHCS from in or about September 2012 through in or about October 2013. Defendant Theodore McCrary, charged in another instrument, prescribed hundreds of thousands of opioid pain killers and other narcotics to thousands of patients at CHCS and EKHCS outside the scope of professional practice and without a legitimate medical purpose.

23. Defendant **COURTNEY NEWMAN**, a resident of Tennessee, was employed as a nurse practitioner at CHCS and EKHCS from in or about October 2013 through in or about March 2014. Defendant **COURTNEY NEWMAN** prescribed hundreds of thousands of opioid pain killers and other narcotics to hundreds of patients at CHCS and EKHCS outside the scope of professional practice and without a legitimate medical purpose.

24. Defendant **CYNTHIA CLEMONS**, a resident of Tennessee, was employed as a nurse practitioner at CHCS and EKHCS from in or about November 2013 through in or about March 2015. Defendant Cynthia Clemons charged in another instrument, prescribed hundreds of

9

thousands of opioid pain killers and other narcotics to thousands of patients at CHCS and EKHCS outside the scope of professional practice and without a legitimate medical purpose.

25. Defendant **HOLLI WOMACK**, a.k.a. **HOLLI CARMICHAEL**, a resident of Tennessee, was employed as a nurse practitioner at EKHCS from in or about August 2013 through in or about July 2014. Defendant **HOLLI WOMACK**, a.k.a. **HOLLI CARMICHAEL**, prescribed hundreds of thousands of opioid pain killers and other narcotics to thousands of patients at CHCS and EKHCS outside the scope of professional practice and without a legitimate medical purpose.

26. Clyde Christopher Tipton, charged in another instrument, a resident of Tennessee and Florida, held ownership interests in CHCS, EKHCS, and various shell companies, including Genesis, and various other companies, including Pinnacle, for various spans of time between in or about May 2011 and in or about July 2016. Clyde Christopher Tipton, charged in another instrument, personally enriched himself with millions of dollars as a result of his ownership of those Pain Clinics and related entities.

27. Maynard Alvarez charged in another instrument, a resident of Knox County, Tennessee, held ownership interests in Genesis for various spans of time between in or about August 2013 and in or about July 2016. Maynard Alvarez charged in another instrument personally enriched himself with millions of dollars as a result of his ownership of Genesis and related entities.

10

**LUCA SARTINI**
**LUIGI PALMA, a.k.a. "Jimmy Palma"**
**BENJAMIN RODRIGUEZ**
**SYLVIA HOFSETTER**

28.    Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

### Background

At all times relevant to this Superseding Indictment:

29.    The defendants, **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** **BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, and others, known and unknown to the Grand Jury, were members, employees, and associates of the Urgent Care and Surgery Center enterprise ("UCSC enterprise"), a criminal organization which was engaged in, among other things, drug trafficking, money laundering, and wire fraud, and which operated in the states of Tennessee and Florida, and elsewhere.

30.    The UCSC enterprise was organized and lead by **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**.   **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** owned and operated Pain Clinics, sometimes named "Urgent Care and Surgery Centers," in Florida and Tennessee where there was a heavy concentration of people addicted to opioids.   The UCSC enterprise would service customers by distributing mass quantities of narcotics via the Pain Clinics.   Thus, the "Urgent Care and Surgery Centers" were, in reality, pill mills.

31.    Defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** **BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, as well as Clyde Christopher

11

Tipton, charged in another instrument, were aware that individuals would travel to and from distant locations in order to illegally obtain Controlled Substances. Defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ, SYLVIA HOFSTETTER,** and Clyde Christopher Tipton, charged in another instrument, were aware that individuals requested prescriptions for large quantities of Schedule II Controlled Substances. Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, as well as Clyde Christopher Tipton, charged in another instrument, were aware that patients could sell, distribute, illegally inject, snort, crush and otherwise abuse or divert Schedule II Controlled Substances, and that patients' propensity to do so was not insignificant. Defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, as well as coconspirator Clyde Christopher Tipton, charged in another instrument, would operate Pain Clinic locations in both the states of Florida and Tennessee to profit from a perceived demand for Controlled Substances in those locations.

32.     At various times in the conspiracy, the UCSC enterprise would operate more than one Pain Clinic in an effort to maximize profits derived from distributing mass quantities of narcotics. For example, with respect to the Tennessee Pain Clinics, patients discharged from one UCSC Pain Clinic would sometimes be referred or sent to another UCSC Pain Clinic. The charts for those patients would be altered by removing any negative history, such as discharged letters, and sent to the other UCSC Pain Clinic as new patients.

33.     The UCSC enterprise hired medical providers at their Pain Clinics who prescribed massive quantities of opioids and other controlled substances to thousands of purported pain patients in exchange for grossly excessive fees. Generally, the Pain Clinics did not accept

insurance. The vast majority of the prescriptions were unreasonable and medically unnecessary. Patients were required to keep follow-up appointments every 28 days to continue receiving their prescriptions, but would receive a 30-day prescription for narcotics. Once the UCSC enterprise discovered that drug screening could be highly profitable in and of itself, providers at the Pain Clinics ordered medically unnecessary drug screenings for every patient every 28 days.

34. The UCSC enterprise employed members or associates of the enterprise such as defendant **SYLVIA HOFSTETTER**, and others known and unknown to the Grand Jury, to open and/or manage the Pain Clinics in order to hire staff, to include medical professionals, manage the finances of the clinics, and report earnings to defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and Clyde Christopher Tipton, charged in another instrument.

35. Approximately 700 UCSC enterprise patients are now dead. A significant percentage of those deaths, directly or indirectly, were the result of overdosing on narcotics prescribed by the UCSC enterprise. The narcotics prescribed by the UCSC enterprise contributed to the deaths of another significant percentage of those patients.

36. Given the high volume of patients frequenting their Pain Clinics, the UCSC enterprise employed armed security guards at its clinic locations to minimize the disruption to nearby businesses and minimize complaints from the public. Such efforts were not always successful and on at least one occasion, a USCS enterprise Pain Clinic was closed in response to such complaints.

37. The UCSC enterprise created and utilized multiple shell companies and bank accounts in order to transfer, conceal, and disguise the source of the proceeds from the Pain Clinics. The UCSC enterprise shell companies and bank accounts would be used to ultimately

13

transfer the proceeds from the Pain Clinics to accounts owned and operated by defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ, SYLVIA HOFSTETTER**, and Clyde Christopher Tipton, charged in another instrument.

### The Enterprise

38. At all times relevant to this Count of the Third Superseding Indictment, there existed in the Eastern District of Tennessee, and elsewhere, a criminal organization, namely, the UCSC enterprise, consisting of defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, Clyde Christopher Tipton, charged in another instrument, the entities, Genesis, Medfix; Palma Family Management; L.D.L. Investments; LELF Global Healthcare; Shadd Management; and Send Message International, Inc., and others known and unknown to the Grand Jury. The UCSC enterprise, including its leadership, members, and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact, which engaged in and the activities of which affected interstate and foreign commerce. The UCSC enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

39. In addition to being members or associates of the enterprise, the defendants served in various roles within the enterprise, including the following:

    a. **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** were the leaders and organizers of the enterprise. They recruited new members, identified potential locations for Pain Clinics, and directed the proceeds of the enterprise via shell corporations.

14

b.    **SYLVIA HOFSTETTER** was the "Administrator" of Pain Clinics in both Florida and Tennessee.    She hired staff and medical professionals, ran the daily operations of the Pain Clinics, and reported the earnings of the Pain Clinics to **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**.    In return, she was given a generous salary and was allowed to charge thousands of dollars in personal expenses to the various Pain Clinics.

c.    Clyde Christopher Tipton, charged in another instrument, was a partner/owner of the Tennessee Pain Clinics with defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**.

### Purposes of the Enterprise

40.    The purposes of the UCSC enterprise included, but were not limited to, the following:

a.    Providing the UCSC enterprise and its leaders, members and associates with an expanding patient base for narcotics distribution;

b.    Generating, preserving, and protecting UCSC enterprise members' and associates' profits and patient base through acts of, among other things, unlawful drug distribution, money laundering, wire fraud, heath care fraud, and kickback violations;

c.    Promoting and enhancing the UCSC enterprise and its leaders', members' and associates' activities;

d.    Concealing and otherwise protecting the criminal activities of the UCSC enterprise and its participants from detection and prosecution;

15

e.      As to **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** intentionally creating the appearance of having connections to criminal organizations in order operate UCSC enterprise pill mills in a profitable manner.

f.      Concealing, disguising, and protecting the financial proceeds of the UCSC enterprise's racketeering activities by laundering the proceeds of the Pain Clinics via wire transfer, shell companies, and various bank accounts.

### Manner and Means of the Enterprise

41.      The manner and means used by the UCSC enterprise members and associates to conduct and participate in the conduct of the affairs of the enterprise, included but were not limited to, the following;

42.      Defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER,** as well as Clyde Christopher Tipton, charged in another instrument, operated their various Pain Clinics to generate criminal proceeds through the illegal distribution and dispensing of Controlled Substances by means of prescriptions or orders without a legitimate medical purpose and outside the usual course of professional practice.

43.      Defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, as well as Clyde Christopher Tipton, charged in another instrument, insulated the UCSC enterprise members and associates from criminal liability prosecution by creating the appearance of legitimate medical practice.

44.      The UCSC enterprise operated a dispensary attached to the Hollywood Clinic in order for purported pain patients to receive and fill their opioid prescription immediately with the UCSC enterprise, and to profit from the high demand for opioid pain killers in multiple ways.

16

45.    Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**, as well as Clyde Christopher Tipton, charged in another instrument, disguised their ownership of the clinics through the use of management companies and physician nominee owners when the true ownership of the clinics always vested in defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODIRGUEZ**, as well as Clyde Christopher Tipton, charged in another instrument.

46.    Defendant **SYLVIA HOFSTETTER** constantly pressured medical providers employed by the UCSC enterprise to see larger numbers of patients in order to maximize profits for the UCSC enterprise.   These medical providers, and others known and unknown to the Grand Jury, accordingly refrained from individualized and particularized treatment plans for patients in order to expedite the illegal dispensing of Controlled Substances.   Although the patient charting forms superficially referenced particularized treatment plans, there was but one treatment plan for virtually each and every patient who walked through the door, and that was to prescribe high volumes of powerful opioid pain killers with high propensities for abuse and diversion.

47.    Medical providers at clinics operated and/or owned by defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**, as well as Clyde Christopher Tipton, charged in another instrument, generally prescribed a standard "cocktail" that consisted of a large quantity of immediate release oxycodone of the highest strength available, a large quantity of time-release opioids, to include but not limited to oxycodone, oxymorphone, morphine, and medications that included but were not limited to benzodiazepines, muscle relaxers, and anti-seizure medications.

17

48.     Defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others known and unknown to the Grand Jury, utilized Sterling for the Drug Screening of patients' urine from the Tennessee Pain Clinic.   Defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma**, along with Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, received illegal kickbacks from Sterling for sending these specimens to Sterling via Genesis, the shell company set up to disguise the kickbacks as "marketing commissions."

49.     Sterling, by and through its agents, paid so-called commission payments to the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as to Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, through Genesis, in return for causing Medicare beneficiaries to be referred to Sterling for medically unnecessary Drug Screening.   The defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, regarded the "commission payments" as bribes or kickbacks in return for sending business to Sterling.   Thus, defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, caused Sterling to submit claims to Medicare for medically unnecessary urine testing for Medicare beneficiaries.

50.     Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** **BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER**, as well as Clyde Christopher Tipton, charged in another instrument, adjusted UCSC policies and procedures to circumvent and/or appear to comply with federal and state laws when the laws addressing various aspects of

18

owning and operating Pain Clinics were amended in order to preserve and maintain the UCSC enterprise.

51.     Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ,** as well as Clyde Christopher Tipton, charged in another instrument, would create and/or utilize shell corporations to include, but not limited to: Palma Family Management; L.D.L. Investments; LELF Global Healthcare; Shadd Management; and Send Message International, Inc., to receive and launder proceeds from UCSC Pain Clinics.

52.     Defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** would utilize dozens of bank accounts to launder the proceeds from Pain Clinics operated by the UCSC enterprise.

### The Racketeering Conspiracy

53.     Beginning on a date unknown, but at least from in or about April 2009, and continuing to on or about March 10, 2015, both dates being approximate and inclusive, within the Eastern District of Tennessee and elsewhere, defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,**
**SYLVIA HOFSETTER,**

and others known and unknown to the Grand Jury, being persons employed by and associated with the UCSC enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the UCSC enterprise through a pattern of racketeering activity as defined in Title 18, United States Code, Section 1961(1) and (5), consisting of:

19

a.   Multiple offenses involving Trafficking in Controlled Substances in violation of:

   (1)   Title 21, United States Code, Sections 841(a)(1) and 846 (Relating to the manufacturing, receiving, concealment, buying selling or otherwise dealing in Controlled Substances);

b.   Multiple acts indictable under the following provisions of federal law:

   (1)   Title 18, United States Code, Section 1343 (Relating to Wire Fraud);

   (2)   Title 18, United States Code, Section 1956 (Relating to Money Laundering); and

   (3)   Title 18, United States Code, Section 1957 (Relating to Money Laundering)

It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## RICO Overt Acts

54.   In furtherance of the conspiracy and to achieve the object and purposes thereof, the defendants, and others known and unknown to the Grand Jury, performed or caused to be performed the following overt acts, among others, in the Eastern District of Tennessee, and elsewhere:

54.1   From in or about April 2009 through on or about March 10, 2015, in the Eastern District of Tennessee, and elsewhere, defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and **SYLVIA HOFSTETTER** did combine, conspire, confederate, and agree with one another and others to knowingly, intentionally, and without authority commit violations of Title 21, United States Code, Section 841(a)(1), that is, to distribute and dispense, and cause to be distributed and dispensed, outside the scope of

20

professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, oxymorphone, and morphine, Schedule II controlled substances, all in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).

54.2    In or about April 2009, unindicted coconspirator A incorporated Urgent Care and Surgery Center, Inc., a Florida for-profit corporation, for the purpose of operating the Hollywood Clinic.

54.3    In or about January 2010, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUZ** opened the Hollywood Clinic on Hollywood Boulevard in Hollywood, Florida.

54.4    In or about 2009 or early 2010, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** employed defendant **SYLVIA HOFSTETTER** at the Hollywood Clinic.

54.5    From in or about January 2010 to in or about July 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ**, along with unindicted coconspirator C, operated a dispensary at the Hollywood Clinic so patients could fill their prescriptions onsite.

54.6    In or about 2010, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** travelled to Tennessee to meet with Clyde Christopher Tipton, charged in another instrument, and others to order to open Pain Clinics in Tennessee.

54.7    In or about 2010, an individual known to the Grand Jury was over- prescribed an opioid-based combination of narcotics on several occasions as a patient of the Hollywood Clinic that was outside the scope of professional practice and not for a legitimate medical purpose.

54.8    On or about March 4, 2010, unindicted coconspirator B over-prescribed an opioid based-combination of narcotics to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic that was outside the scope of professional practice and not for a legitimate medical purpose.

54.9    On or about March 5, 2010, unindicted coconspirator B over-prescribed an opioid-based combination of narcotics to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic that was outside the scope of professional practice and not for a legitimate medical purpose.

54.10    On or about April 1, 2010, unindicted coconspirator B over-prescribed an opioid-based combination of narcotics to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic despite being told that the agent had not taken all of the oxycodone that unindicted coconspirator B had over-prescribed the previous month.

54.11    On or about April 29, 2010, unindicted coconspirator B increased the dosage of oxycodone to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic that was outside the scope of professional practice and not for a legitimate medical purpose.

54.12    On or about April 29, 2010, unindicted coconspirator B over-prescribed an opioid based combination of narcotics to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic that was outside the scope of professional practice and not for a legitimate medical purpose.

54.13   On or about June 25, 2010, unindicted coconspirator B over-prescribed oxycodone to an undercover agent with the Drug Enforcement Administration at the Hollywood Clinic after the agent told unindicted coconspirator B that he had made money on the sale of oxycodone from "running a crew" into another Pain Clinic in Jacksonville, Florida.

54.14   On or about June 25, 2010, defendant **SYLVIA HOFSTETTER** admonished and discharged an undercover agent with the Drug Enforcement Administration as a patient for speaking about selling oxycodone inside the Hollywood Clinic, but gave the agent the new prescription for oxycodone anyway.

54.15   On or about October 14, 2010, defendant **BENJAMIN RODRIGUEZ** emailed unindicted coconspirator H, a UCSC employee, a detailed list of items necessary to complete the UCSC Pain Clinic set-up in Tennessee.

54.16   On or about November 10, 2010, defendant **LUCA SARTINI** wired $3,705.00 of Hollywood Clinic funds to a property management group in Tennessee for the lease of an UCSC Tennessee clinic.

54.17   On or about November 16, 2010, defendant **LUCA SARTINI** formed Urgent Care and Surgery Center – Knoxville, LLC as the LLC associated with the first UCSC Pain Clinic in Tennessee.   Eventually, that Pain Clinic was named Comprehensive Healthcare Systems.

54.18   On or about November 19, 2010, unindicted coconspirator B over-prescribed an opioid-based combination of narcotics to K.C., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   K.C. ingested and fatally overdosed two days later on one or more controlled substances.

Case 3:15-cr-00027-TAV-DCP   Document 278   Filed 01/04/18   Page 23 of 68   PageID #: 4659

54.19   On or about December 2, 2010, defendant **LUCA SARTINI** signed a lease for a UCSC Pain Clinic located at Suite 224, 301 South Gallaher View Road, Knoxville, Tennessee.

54.20   On or about December 21, 2010, defendant **LUCA SARTINI** and unindicted coconspirator C incorporated Medfix, LLC, a for-profit Florida corporation.

54.21   On various dates between in or about January 2011 through in or about March 2015, defendant **SYLVIA HOFSTETTER** consistently mandated that UCSC employees fill vacant provider appointment slots to keep patient volume high at the UCSC Pain Clinics in Tennessee.

54.22   In or about January 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ,** and **SYLVIA HOFSTETTER** opened a UCSC Pain Clinic called Comprehensive Healthcare Systems, located at 301 South Gallaher View Road, Suite 224, Knoxville, Tennessee.

54.23   On or about March 2, 2011, defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma"** traveled to Knoxville, Tennessee to meet with defendant **SYVLIA HOFSTETTER** and Clyde Christopher Tipton, charged in another instrument, in order to discuss business relating to the Tennessee Pain Clinics.

54.24   In or about May 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUZ,** and **SYLVIA HOFSTETTER** opened a UCSC Pain Clinic located at 780 Highway 321, Lenoir City, Tennessee.

54.25   On or about May 19, 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $9,000 from the UCSC Pain Clinic located on Gallaher View Road, Knoxville, Tennessee, all or most of which constituted illegal drug trafficking proceeds.

24

54.26   On or about July 15, 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $12,000 from the UCSC Pain Clinic located on Gallaher View Road, Knoxville, Tennessee, all or most of which constituted illegal drug trafficking proceeds.

54.27   On or about October 24, 2011, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ,** as well as Clyde Christopher Tipton, charged in another instrument, each received $5,000 from the UCSC Pain Clinic located in Lenoir City, Knoxville, Tennessee, all or most of which constituted illegal drug trafficking proceeds.

54.28   On or about November 3, 2011, unindicted coconspirator E over-prescribed an opioid-based combination of narcotics to W.B., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

54.29   On or about November 18, 2011, defendant **SYLVIA HOFSTETTER** contacted defendant **LUCA SARTINI** regarding the termination of M.B., the medical director for the UCSC Lenoir City and Knoxville Pain Clinics.

54.30   In or about 2012, an UCSC employee known to the Grand Jury was told to provide defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** with daily "Quickbooks" reports on the financials of the UCSC Pain Clinics.

54.31   From in or about 2012 to in or about 2013, defendant **SYLVIA HOFSTETTER** directed other UCSC employees known to the Grand Jury to send discharged patients from one UCSC Pain Clinic to another.

54.32    On or about January 11, 2012, defendants **LUCA SARTINI** and **SYLVIA HOFSTETTER,** along with Clyde Christopher Tipton, charged in another instrument, opened a Bank of America account number xxxx9859 ("UCSCM-9859") and listed the account holder as "Urgent Care and Surgery Center Management."

54.33    From in or about January 2012 to in or about March 2015, the UCSCM-9859 account was entirely funded with proceeds from the UCSC Pain Clinics located on Gallaher View Road, Knoxville, Tennessee and in Lenoir City, Tennessee.

54.34    On or about February 13, 2012, defendant **SYLVIA HOFSTETTER** sent defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ** and Clyde Christopher Tipton, charged in another instrument, the "daily sales report" for the two UCSC Pain Clinics located in Lenoir City and Knoxville, Tennessee.

54.35    On or about September 11, 2012, Richard Larson, previously charged in another instrument, over-prescribed an opioid-based combination of narcotics to C.H., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.    C.H. ingested and fatally overdosed approximately three days later on one or more controlled substances.

54.36    On or about September 19, 2012, unindicted coconspirator F over-prescribed an opioid-based combination of narcotics to R.S., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

54.37    On or about October 5, 2012, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $13,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received

26

$7,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.38   On or about October 24, 2012, unindicted coconspirator E over-prescribed an opioid-based combination of narcotics to J.B., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

54.39   On or about November 9, 2012, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $9,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $5,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.40   In or about December 17, 2012, Theodore McCrary, charged in another instrument, over prescribed an opioid-based combination of narcotics to B.P., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.   B.P. ingested and fatally overdosed approximately five days later on one or more controlled substances.

54.41   In or about January 2013, defendant **SYLVIA HOFSTETTER** told an UCSC employee that she had fired M.V., an individual known to the Grand Jury, for discharging too many UCSC Pain Clinic patients and otherwise disagreeing with her about medical decisions.

54.42   From on or about February 5, 2013 through on or about February 7, 2013, defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** travelled to Knoxville, Tennessee to conduct UCSC enterprise business.

54.43   On or about February 12, 2013, unindicted coconspirator G over-prescribed an opioid-based combination of narcotics to G.H., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

54.44   On or about February 18, 2013, unindicted coconspirator G over-prescribed an opioid-based combination of narcotics to R.S., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.

54.45   On or about February 21, 2013, Alan Pecorella, charged in another instrument, over-prescribed an opioid-based combination of narcotics to D.T., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   D.T. ingested and fatally overdosed approximately two days later on one or more controlled substances.

54.46   On or about February 21, 2013, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $18,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $10,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.47   In or about March 2013, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ**, and Clyde Christopher Tipton, charged in another instrument, signed the Operating Agreement for Urgent Care and Surgery Center Management, LLC, a shell company utilized to dispense the proceeds from the UCSC enterprise Pain Clinics.

54.48   On or about March 12, 2013, defendant Theodore McCrary, charged in another instrument, over-prescribed an opioid-based combination of narcotics to C.S., an individual

known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose. C.S. ingested and fatally overdosed approximately five days later on one or more controlled substances.

54.49   On or about March 14, 2013, the UCSC enterprise issued a check in the amount of $101,690.00 to purchase a residence located on Falcon Point Drive, Knoxville, Tennessee, with UCSC Pain Clinic proceeds for use by defendant **SYLVIA HOFSTETTER**.

54.50   In or about April 2013, an UCSC employee unknown to the Grand Jury pre-filled out the "pain interview" form for C.S. in anticipation of his April 9, 2013 visit to the UCSC Pain Clinic.

54.51   On or about April 9, 2013, Theodore McCrary, charged in another instrument, over-prescribed an opioid-based combination of narcotics to J.G., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.   Later that day, after filling McCrary's prescription and consuming some of the prescribed opioids, J.G. recklessly operated her automobile while intoxicated on the prescribed opioids, wrecked her automobile on Lovell Road in Knoxville, Tennessee, and killed both of her passengers, who were also patients at the UCSC clinics.

54.52   On or about May 3, 2013, unindicted coconspirator J over-prescribed an opioid-based combination of narcotics to L.C., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

54.53   On or about May 24, 2013, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $11,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received

29

$7,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.54  On or about June 3, 2013, defendant Theodore McCrary, charged in another instrument, over-prescribed an opioid-based combination of narcotics to J.P., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   J.P. ingested and fatally overdosed approximately a day later on one or more controlled substances.

54.55   In or about July 2013, an UCSC employee unknown to the Grand Jury pre-filled out the "pain interview" form for J.P. in anticipation of his July 2013 visit to the UCSC Pain Clinic.

54.56  On or about July 9, 2013, Alan Pecorella, charged in another instrument, over-prescribed an opioid-based combination of narcotics to W.B., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose. W.B. ingested and fatally overdosed approximately two days later on one or more controlled substances.

54.57  On or about July 17, 2013, unindicted coconspirator J over-prescribed an opioid-based combination of narcotics to an undercover agent with the Federal Bureau of Investigation that was outside the scope of professional practice and not for a legitimate medical purpose.

54.58  On or about July 30, 2013, defendant Theodore McCrary, charged in another instrument, over-prescribed an opioid-based combination of narcotics to A.O., an individual known to the Grand Jury, that was outside the scope of professional practice and not for a legitimate medical purpose.

30

54.59   Between in or about August 2013 and in or about March 2015, the defendants,

**LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher

Tipton and Maynard Alvarez, both charged in another instrument, and others, caused the

submission of approximately $1,172,747 in claims to Medicare for medically unnecessary

services purportedly provided by Sterling.

54.60   On or about August 6, 2013, unindicted coconspirator G over-prescribed an

opioid-based combination of narcotics to J.L., an individual known to the Grand Jury, that was

outside the scope of professional practice and not for a legitimate medical purpose.   J.L.

ingested and fatally overdosed two days later on one or more controlled substances.

54.61   On or about August 14, 2013, unindicted coconspirator G over-prescribed an

opioid-based combination of narcotics to an undercover agent with the Federal Bureau of

Investigation that was outside the scope of professional practice and not for a legitimate medical

purpose.

54.62   On or about September 3, 2013, defendant Theodore McCrary, charged in another

instrument, over-prescribed an opioid-based combination of narcotics to R.W., an individual

known to the Grand Jury, that was outside the scope of professional practice and not for a

legitimate medical purpose.

54.63   On or about September 26, 2013, Richard Larson, charged in another instrument

over-prescribed an opioid-based combination of narcotics to B.F., an individual known to the

Grand Jury, that was outside the scope of professional practice and not for a legitimate medical

purpose.

54.64   On or about October 4, 2013, defendant **SYLVIA HOFSTETTER** contacted

Clyde Christopher Tipton, charged in another instrument, regarding the requirement of a

nonrefundable deposit in order to review the financial records of a group of primary care clinics in Knoxville, Tennessee, that defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **SYLVIA HOFSTETTER**, as well as Clyde Christopher Tipton, charged in another instrument, were considering purchasing.

54.65    On or about October 22, 2013, defendant **SYLVIA HOFSTETTER** contacted Clyde Christopher Tipton, charged in another instrument, in order to update him on her conversation with defendant **LUCA SARTINI** and David Brickhouse, previously charged in another instrument, regarding the purchase of additional Tennessee clinics.

54.66    On or about October 25, 2013 defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $9,500 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $6,500 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.67    On or about November 8, 2013, defendant **LUCA SARTINI** was in Knoxville, Tennessee for UCSC Pain Clinic matters.

54.68    On or about December 4, 2013, unindicted coconspirator J over-prescribed an opioid-based combination of narcotics to T.C., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.    T.C. ingested and fatally overdosed the next day on one or more controlled substances.

54.69    On or about January 24, 2014, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $10,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received

$6,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.70   On or about February 10, 2014, Cynthia Clemons over-prescribed an opioid-based combination of narcotics to S.B., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   S.B. ingested and fatally overdosed two days later on one or more controlled substances.

54.71   On or about February 11, 2014, Courtney Newman over-prescribed an opioid-based combination of narcotics to J.S., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   J.S. ingested and fatally overdosed three days later on one or more controlled substances.

54.72   On or about April 25, 2014, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $7,500 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $4,500 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.73   On or about August 8, 2014, Cynthia Clemons over-prescribed an opioid-based combination of narcotics to an undercover agent with the Federal Bureau of Investigation that was outside the scope of professional practice and not for a legitimate medical purpose.

54.74   On or about August 14, 2014, Holli Womack, a.k.a. "Holli Carmichael," over-prescribed an opioid-based combination of narcotics to D.J., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose. D.J. ingested and fatally overdosed a day later on one or more controlled substances.

33

54.75   On or about August 18, 2014, defendants **LUCA SARTINI, LUIGI PALMA,** **a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $11,000 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $7,000 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.76   On or about October 3, 2014, unindicted coconspirator L over-prescribed an opioid-based combination of narcotics to K.O., an individual known to the Grand Jury that was outside the scope of professional practice and not for a legitimate medical purpose.   K.O. ingested and fatally overdosed approximately 11 days later on one or more controlled substances.

54.77   On or about November 14, 2014, one or more coconspirators at Sterling wired $284,489.91 into the Genesis bank account ending in 5508.

54.78   On or about November 21, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $47,813.95 from Genesis, which was funded by the November 14, 2014 Sterling wire monies.

54.79   On or about November 25, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1013 for $11,500 to the LDL Investments LLC (LDL) bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

54.80   On or about November 25, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1014 for $11,500, to the MATLEO Investment LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

54.81 On or about December 15, 2014, one or more coconspirators at Sterling wired $341,716.93 into the Genesis bank account ending in 5508.

54.82 On or about December 18, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $64,450.07 from Genesis, which was funded by the December 15, 2014 Sterling wire monies.

54.83 On or about December 23, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1020 for $16,000 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

54.84 On or about December 23, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1021 for $16,000 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

54.85 On or about January 15, 2015, one or more coconspirators at Sterling wired $272,422.42 into the Genesis bank account ending in 5508.

54.86 On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $49,050.00 from Genesis, which was funded by the January 15, 2015 Sterling wire monies.

54.87 On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1026 for $12,050 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

54.88   On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1024 for $12,050 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

54.89   On or about February 9, 2015, defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **BENJAMIN RODRIGUEZ** each received $14,500 from the UCSCM-9859 account, and Clyde Christopher Tipton, charged in another instrument, received $8,500 from the UCSCM-9859 account, all or most of which constituted illegal drug trafficking proceeds.

54.90   On or about February 12, 2015, unindicted coconspirator L over-prescribed an opioid-based combination of narcotics to an undercover agent with the Federal Bureau of Investigation that was outside the scope of professional practice and not for a legitimate medical purpose.

54.91   On or about February 13, 2015, one or more coconspirators at Sterling wired $335,761.50 into the Genesis bank account ending in 5508.

54.92   On or about February 15, 2015, defendant **LUCA SARTINI** requested the partner distribution for UCSC Pain Clinics from defendant **SYLVIA HOFSTETTER**.

54.93   On or about February 18, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $74,604.45 from Genesis, which was funded by the February 13, 2015 Sterling wire monies.

54.94   On or about February 19, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1029

for $24,750 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

54.95   On or about February 19, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1027 for $24,750 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

54.96   On or about February 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $26,000 from Genesis, which was funded by the February 13, 2015 Sterling wire monies.

54.97   On or about February 26, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1029 for $8,500 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

54.98   On or about February 26, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1030 for $8,500 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

### NOTICE OF SPECIAL SENTENCING FACTORS FOR COUNT ONE

**(Death or Serious Bodily Injury Resulting from Use of Controlled Substance)**

55.     The allegations contained in Paragraphs 1 through 54.98 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

56.     As a result of violations of Title 21 U.S.C. Sections 841 and 846 by defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER,**

**CYNTHIA CLEMONS**, and Theodore McCrary, charged in another instrument, and others, the below specified deaths did result from the use of a controlled substance, namely, oxycodone, a Schedule II controlled substance, all in violation of the enhanced penalty provisions of Title 21, United States Code, Section 841(b)(1)(C).

a.  On or about September 11, 2012, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (C.H.) did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Richard Larson, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

b.  On or about March 16, 2013, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (C.S.), did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Theodore McCrary, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

c.  On or about June 3, 2013, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (J.P.), did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and

caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Theodore McCrary, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

d. On or about February 12, 2014, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (S.B.), did fatally ingest and overdose on a controlled substance, namely, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Cynthia Clemons, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

All in violation of 18 U.S.C. § 1962(d).

## RICO CONSPIRACY FORFEITURE ALLEGATIONS

57. The allegations contained in Paragraphs 1 through 56 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1963.

58. Pursuant to Title 18, United States Code, Section 1963(a)(1)-(3), upon conviction of an offense in violation of Title 18, United States Code, Section 1962, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,**
**SYLVIA HOFSETTER,**

shall forfeit to the United States of America:

a. any interest acquired or maintained in violation of section 1962;

39

b.  any interest in, security, of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

c.  any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 1962.

The property to be forfeited includes, but is not limited to:

A.  **Money Judgment**

A personal money judgment against defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ, and SYLVIA HOFSTETTER**, and in favor of the United States, for up to $21,255,956, which represents the maximum amount of money the defendants personally obtained, directly or indirectly, as a result of the violations of 18 U.S.C. § 1962.

B.  **Bank Accounts**

1)  The contents of Bank of America, bank account number xxxx-4433, account holder East Tennessee Healthcare Services LLC;

2)  The contents of Bank of America, bank account number xxxx-9859, account holder Urgent Care & Surgery Center Mgmt LLC;

3)  The contents of Bank of America, bank account number xxxx-9888, account holder Comprehensive Healthcare Systems of Knoxville PC;

4)  The contents of Bank of America, bank account number xxxx-9875, account holder Comprehensive Healthcare Systems of Lenoir City PC;

5)  The contents of Bank of America, bank account number xxxx-4135, account holder East Knoxville Healthcare Services LLC;

6)  The contents of FSG Bank, bank account number xxxx 4322, account holder Sylvia Hofstetter;

7)  The contents of FSG Bank, bank account number xxxx 8537, account holder Sylvia Hofstetter;

8) The contents of FSG Bank, bank account number xxxx 6140, account holder Urgent Care & Surgery Center Mgmt LLC;

9) The contents of FSG Bank, bank account number, xxxx 0653, account holder Prodigal Primary Care;

10) The contents of FSG Wealth, account number xxxx-3681, account holder Sylvia S. Hofstetter Agency, FSG Bank, Agent;

11) The contents of SunTrust Bank, bank account number xxxx5493, account holder TCHS Management LLC;

12) The contents of Bank of America, bank account number xxxx-3968, account holder Shadd Management Services, LLC;

13) $44,013.83 U.S. Currency seized from Bank of America Account Number xxxxx2107 in the name of LDL Investments;

14) $4,324.77 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini;

15) $4,424.85 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini; and

16) $18,350.92 in funds from Bank Account Number xxxxx9752 in the name of Palma Family Management Company LLC.

C.  **Vehicles**

1) 2014 Lexus IS 250, VIN number JTHBF1D22E5020719, purchased by Sylvia Hofstetter, possessed by Sylvia Gil.

2) 2015 Lexus GS350 Sedan, VIN number JTHCE1BL6FA000257, License number T5356T, seized from Sylvia Hofstetter on March 10, 2015 at 1842 Falcon Pointe Drive, Knoxville, Tennessee.

D.  **Real Property**

1) Real property known and numbered as **1842 Falcon Pointe Drive, Knoxville, TN 37922,** with all appurtenances, improvements, and attachments thereon, is more fully described as:

SITUATED in the 6th Civil District of Knox County, Tennessee, and without the corporate limits of the City of Knoxville, Tennessee, and being known and designated as Lot 30 of Falcon Pointe, Unit 1, as shown

41

on plat of record as Instrument #200409100021975 in the Register's Office for Knox County, Tennessee, to which plat specific reference is hereby made for a more particular description.

For further reference see Quit Claim Deed conveying the property to Sylvia Hofstetter recorded on April 29, 2013 in Instrument Number 201304290071002 in the Knox County, Tennessee Register of Deeds.

2) Real Property located at 1307 West Simpson Road, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 340.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

3) Real Property located at 780 Highway 321 North, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 341.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 18, United States Code, Section 1963(m).

42

## Count Two

**(Conspiracy to Distribute and Dispense Controlled Substances – 21 U.S.C. § 846)**

59.    The allegations contained in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

60.    The Grand Jury further charges that, from a date unknown, but at least from in or about April 2009, and continuing to on or about March 10, 2015, both dates being approximate and inclusive, within the Eastern District of Tennessee, and elsewhere, defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**SYLVIA HOFSTETTER,**
**COURTNEY NEWMAN,**
**CYNTHIA CLEMONS**, and
**HOLLI WOMACK, a.k.a. HOLLI CARMICHAEL,**

did combine, conspire, confederate, and agree with one another and others to knowingly, intentionally, and without authority commit violations of Title 21, United States Code, Section 841(a)(1), that is, to distribute and dispense, and cause to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, oxymorphone, and morphine, Schedule II controlled substances, all in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).

### ENHANCED PENALTY UNDER TITLE 21, UNITED STATES CODE, SECTION 841(b)(1)(C)

**(Death or Serious Bodily Injury Resulting from Use of Controlled Substance)**

61.    The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

62.     On or about September 11, 2012, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (C.H.), did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Richard Larson, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

63.     On or about March 16, 2013, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (C.S.) did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Theodore McCrary, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

64.     On or about June 3, 2013, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (J.P.) did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and Theodore McCrary,

44

previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

65. On or about November 8, 2013, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (J.R.) did fatally ingest and overdose on one or more controlled substances, including, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **SYLVIA HOFSTETTER** and Theodore McCrary, previously charged in another instrument, and others, to violate in violation of Title 21, U.S.C. 841(b)(1)(C).

66. On or about February 10, 2014, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (S.B.) did fatally ingest and overdose on a controlled substance, namely, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, as a part of the conspiracy between defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER, CYNTHIA CLEMONS**, and others, to violate the federal drug laws as alleged in Count Two.

67. As a result of the conspiracy to violate the federal drug laws by defendants **LUCA SARTINI**, **LUIGI PALMA**, a.k.a. **"Jimmy Palma," SYLVIA HOFSTETTER**, **CYNTHIA CLEMONS,** and Theodore McCrary, charged in another instrument, and others, as alleged in Count Two, death did result from the use of a controlled substance, namely, oxycodone, a Schedule II controlled substance, all in violation of the enhanced penalty provisions of Title 21, United States Code, Section 841(b)(1)(C).

## DRUG CONSPIRACY FORFEITURE ALLEGATIONS

68.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 853.

69.     Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**SYLVIA HOFSTETTER,**
**COURTNEY NEWMAN,**
**CYNTHIA CLEMONS,** and
**HOLLI WOMACK, a.k.a. HOLLI CARMICHAEL,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offenses. The property to be forfeited includes, but is not limited to, the following:

A.     **Money Judgment**

A personal money judgment against defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER, COURTNEY NEWMAN, CYNTHIA CLEMONS,** and **HOLLI WOMACK, a.k.a. HOLLI CARMICHAEL,** and in favor of the United States, for up to $21,255,956, which represents the maximum amount of money the defendants personally obtained, directly or indirectly, for controlled substances during the course of the conspiracy alleged in the Indictment, in violation of 21 U.S.C. §§ 846 and 841.

B.     **Bank Accounts**

1)     The contents of Bank of America, bank account number xxxx-4433, account holder East Tennessee Healthcare Services LLC;

2)     The contents of Bank of America, bank account number xxxx-9859, account holder Urgent Care & Surgery Center Mgmt LLC;

46

3) The contents of Bank of America, bank account number xxxx-9888, account holder Comprehensive Healthcare Systems of Knoxville PC;

4) The contents of Bank of America, bank account number xxxx-9875, account holder Comprehensive Healthcare Systems of Lenoir City PC;

5) The contents of Bank of America, bank account number xxxx-4135, account holder East Knoxville Healthcare Services LLC;

6) The contents of FSG Bank, bank account number xxxx 4322, account holder Sylvia Hofstetter;

7) The contents of FSG Bank, bank account number xxxx 8537, account holder Sylvia Hofstetter;

8) The contents of FSG Bank, bank account number xxxx 6140, account holder Urgent Care & Surgery Center Mgmt LLC;

9) The contents of FSG Bank, bank account number, xxxx 0653, account holder Prodigal Primary Care;

10) The contents of FSG Wealth, account number xxxx-3681, account holder Sylvia S. Hofstetter Agency, FSG Bank, Agent;

11) The contents of SunTrust Bank, bank account number xxxx5493, account holder TCHS Management LLC;

12) The contents of Bank of America, bank account number xxxx-3968, account holder Shadd Management Services, LLC;

13) $44,013.83 U.S. Currency seized from Bank of America Account Number xxxxx2107 in the name of LDL Investments;

14) $4,324.77 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini;

15) $4,424.85 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini; and

16) $18,350.92 in funds from Bank Account Number xxxxx9752 in the name of Palma Family Management Company LLC.

C. **Vehicles**

1) 2014 Lexus IS 250, VIN number JTHBF1D22E5020719, purchased by Sylvia Hofstetter, possessed by Sylvia Gil.

47

2)  2015 Lexus GS350 Sedan, VIN number JTHCE1BL6FA000257, License number T5356T, seized from Sylvia Hofstetter on March 10, 2015 at 1842 Falcon Pointe Drive, Knoxville, Tennessee.

D.  **Real Property**

1)  Real property known and numbered as **1842 Falcon Pointe Drive, Knoxville, TN 37922,** with all appurtenances, improvements, and attachments thereon, is more fully described as:

SITUATED in the 6th Civil District of Knox County, Tennessee, and without the corporate limits of the City of Knoxville, Tennessee, and being known and designated as Lot 30 of Falcon Pointe, Unit 1, as shown on plat of record as Instrument #200409100021975 in the Register's Office for Knox County, Tennessee, to which plat specific reference is hereby made for a more particular description.

For further reference see Quit Claim Deed conveying the property to Sylvia Hofstetter recorded on April 29, 2013 in Instrument Number 201304290071002 in the Knox County, Tennessee Register of Deeds.

2)  Real Property located at 1307 West Simpson Road, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 340.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

3)  Real Property located at 780 Highway 321 North, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 341.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence,

b.  has been transferred or sold to, or deposited with, a third party,

c.  has been placed beyond the jurisdiction of the court,

d.  has been substantially diminished in value, or

e.  has been commingled with other property which cannot be divided without difficulty,

48

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

## Count Three

### (Money Laundering Conspiracy – 18 U.S.C. § 1956(h))

70.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

71.     The Grand Jury further charges that, from a date unknown, but at least from in or about April 2009, and continuing to on or about March 10, 2015, both dates being approximate and inclusive, within the Eastern District of Tennessee, and elsewhere, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,** and
**SYLVIA HOFSTETTER,**

did knowingly, intentionally, and without authority combine, conspire, confederate, and agree with other persons, known and unknown to the Grand Jury, to commit certain offenses against the United States, in violation of Title 18, United States Code, Sections 1956 and 1957, as follows:

a.     to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, conspiracy to violate the federal drugs laws as alleged in Count Two, with the intent to promote the carrying on of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the

49

financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

    b.  to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, conspiracy to violate federal drug laws as alleged in Count Two, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

    c.  to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to violate the federal drugs laws as alleged in Count Two, in order to avoid a transaction reporting requirement under state or federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii); and

    d.  to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, United States currency, such property having been derived from a specified unlawful activity, conspiracy to violate the federal drugs laws as alleged in Count Two, with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1957;

all in violation of Title 18, United States Code, Section 1956(h).

## Counts Four through Eight

## (Money Laundering – 18 U.S.C. § 1957(a))

72.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

73.     The Grand Jury further charges that on or about the following dates, in the Eastern District of Tennessee and elsewhere, the defendant, **SYLVIA HOFSTETTER**, did knowingly engage, attempt to engage, and cause others to engage, in a monetary transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is the withdrawal, deposit, and transfer of funds from and to the financial institutions identified below, such property having been derived from a specified unlawful activity, that is, conspiracy to violate the federal drugs laws as alleged in Count Two:

| Count | On or About Date | Monetary Transaction | Amount |
|-------|------------------|----------------------|--------|
| 4 | March 14, 2013 | Cashier's Check No. 109749, issued to Admiral Title, funded by FSG Account xxxx4322, used to purchase SYLVIA HOFSTETTER'S personal residence at 1842 Falcon Pointe Drive, Knoxville, Tennessee, 37922 | $101,690.00 |
| 5 | May 23, 2014 | Bank Check No. 1173, issued to Lexus of Knoxville, funded by Bank of America Shadd Management Account No. xxxx3968, used to purchase 2014 Lexus IS 250, VIN number JTHBF1D22E5020719 | $30,000.00 |
| 6 | July 5, 2013 | Withdrawal of funds from Bank of America Shadd Management Account No. xxxx3968 then deposited at Harrah's Cherokee Casino, North Carolina for the purpose of gambling | $15,600.00 |

| 7 | August 16, 2013 | Withdrawal of funds from Bank of America Shadd Management Account No. xxxx3968 then deposited at Harrah's Cherokee Casino, North Carolina for the purpose of gambling | $15,000.00 |
| 8 | June 2, 2014 | Withdrawal of funds from Bank of America Shadd Management Account No. xxxx3968 then deposited at Harrah's Cherokee Casino, North Carolina for the purpose of gambling | $14,500.00 |

All in violation of Title 18, United States Code, Section 1957.

## MONEY LAUNDERING FORFEITURE ALLEGATIONS

74.     The allegations contained in Paragraphs 1 through 27, 59 through 60, and 70 through 73 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).

75.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956 or 1957, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,** and
**SYLVIA HOFSTETTER,**

shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

A.     **Money Judgment**

A personal money judgment against defendants **LUCA SARTINI, LUIGI PALMA, a.k.a. "Jimmy Palma," BENJAMIN RODRIGUEZ,** and **SYLVIA HOFSTETTER**, and in favor of the United States, for $21,255,956, which represents the amount of money involved in the money laundering offenses.

B.    **Bank Accounts**

1)    The contents of Bank of America, bank account number xxxx-4433, account holder East Tennessee Healthcare Services LLC;

2)    The contents of Bank of America, bank account number xxxx-9859, account holder Urgent Care & Surgery Center Mgmt LLC;

3)    The contents of Bank of America, bank account number xxxx-9888, account holder Comprehensive Healthcare Systems of Knoxville PC;

4)    The contents of Bank of America, bank account number xxxx-9875, account holder Comprehensive Healthcare Systems of Lenoir City PC;

5)    The contents of Bank of America, bank account number xxxx-4135, account holder East Knoxville Healthcare Services LLC;

6)    The contents of FSG Bank, bank account number xxxx 4322, account holder Sylvia Hofstetter;

7)    The contents of FSG Bank, bank account number xxxx 8537, account holder Sylvia Hofstetter;

8)    The contents of FSG Bank, bank account number xxxx 6140, account holder Urgent Care & Surgery Center Mgmt LLC;

9)    The contents of FSG Bank, bank account number, xxxx 0653, account holder Prodigal Primary Care;

10)   The contents of FSG Wealth, account number xxxx-3681, account holder Sylvia S. Hofstetter Agency, FSG Bank, Agent;

11)   The contents of SunTrust Bank, bank account number xxxx5493, account holder TCHS Management LLC;

12)   The contents of Bank of America, bank account number xxxx-3968, account holder Shadd Management Services, LLC;

13)   $44,013.83 U.S. Currency seized from Bank of America Account Number xxxxx2107 in the name of LDL Investments;

14)   $4,324.77 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini;

53

15) $4,424.85 U.S. Currency seized from Bank of America Account Number xxxxx5489 in the name of Luca Sartini; and

16) $18,350.92 in funds from Bank Account Number xxxxx9752 in the name of Palma Family Management Company LLC.

C. **Vehicles**

1) 2014 Lexus IS 250, VIN number JTHBF1D22E5020719, purchased by Sylvia Hofstetter, possessed by Sylvia Gil.

2) 2015 Lexus GS350 Sedan, VIN number JTHCE1BL6FA000257, License number T5356T, seized from Sylvia Hofstetter on March 10, 2015 at 1842 Falcon Pointe Drive, Knoxville, Tennessee.

D. **Real Property**

1) Real property known and numbered as **1842 Falcon Pointe Drive, Knoxville, TN 37922,** with all appurtenances, improvements, and attachments thereon, is more fully described as:

SITUATED in the 6th Civil District of Knox County, Tennessee, and without the corporate limits of the City of Knoxville, Tennessee, and being known and designated as Lot 30 of Falcon Pointe, Unit 1, as shown on plat of record as Instrument #200409100021975 in the Register's Office for Knox County, Tennessee, to which plat specific reference is hereby made for a more particular description.

For further reference see Quit Claim Deed conveying the property to Sylvia Hofstetter recorded on April 29, 2013 in Instrument Number 201304290071002 in the Knox County, Tennessee Register of Deeds.

2) Real Property located at 1307 West Simpson Road, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 340.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

3) Real Property located at 780 Highway 321 North, Lenoir City, Tennessee 37771, belonging to Urgent Care & Surgery Center Management, LLC, shown on Map 015, Parcel 341.00 and recorded in Book 366, Page 123 at the Loudon County Register of Deeds Office, with all appurtenances, improvements, and attachments thereon.

If any of the property described above, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence,

b.     has been transferred or sold to, or deposited with, a third party,

c.     has been placed beyond the jurisdiction of the court,

d.     has been substantially diminished in value, or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), and Title 18, United States Code, Section 982(b)(1).

### Count Nine

**(Maintaining a Drug-Involved Premises:**
**Urgent Care and Surgery Center/Comprehensive Healthcare Systems,**
**780 Highway 321, Lenoir City, Tennessee—21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2)**

76.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this

Indictment are re-alleged and incorporated by reference as though fully set forth herein.

77.     The Grand Jury further charges that, from in or about May 2011 through on or

about March 10, 2015, both dates being approximate and inclusive, in the Eastern District of

Tennessee, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,**
**SYLVIA HOFSTETTER,**
**COURTNEY NEWMAN**, and
**CYNTHIA CLEMONS,**

aided and abetted by one another, did knowingly and intentionally open, use, and maintain a

business, to wit, **Urgent Care and Surgery Center/Comprehensive Healthcare Systems, 780**

**Highway 321, Lenoir City, Tennessee**, for the purpose of illegally distributing and dispensing

55

Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 856(a)(1), and Title 18, United States Code, Section 2.

## Count Ten

### (Maintaining a Drug-Involved Premises:
### Comprehensive Healthcare Systems, 301 South Gallaher View Road, Suite 224, Knoxville, Tennessee—21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2)

78.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

79.     The Grand Jury further charges that, from in or about January 2011 through in or about August 2013, both dates being approximate and inclusive, in the Eastern District of Tennessee, and elsewhere, the defendants,

**LUCA SARTINI,**
**LUIGI PALMA, a.k.a. "Jimmy Palma,"**
**BENJAMIN RODRIGUEZ,** and
**SYLVIA HOFSTETTER,**

aided and abetted by one another, did knowingly and intentionally open, use, and maintain a business, to wit, **Comprehensive Healthcare Systems, 301 South Gallaher View Road, Suite 224, Knoxville, Tennessee**, for the purpose of illegally distributing and dispensing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 856(a)(1), and Title 18, United States Code, Section 2.

56

## Count Eleven

### (Maintaining a Drug-Involved Premises:
### East Knoxville Healthcare Services, 509 Lovell Road,
### Knoxville, Tennessee—21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2)

80.     The allegations contained in Paragraphs 1 through 27 and 59 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

81.     The Grand Jury further charges that, from in or about September 2013 through on or about March 10, 2015, both dates being approximate and inclusive, in the Eastern District of Tennessee, and elsewhere, the defendants,

**SYLVIA HOFSTETTER**,
**COURTNEY NEWMAN**,
**CYNTHIA CLEMONS**, and
**HOLLI WOMACK, a.k.a. HOLLI CARMICHAEL**,

aided and abetted by one another, did knowingly and intentionally open, use, and maintain a business, to wit, **East Knoxville Healthcare Services, 509 Lovell Road, Knoxville, Tennessee**, for the purpose of illegally distributing and dispensing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 856(a)(1), and Title 18, United States Code, Section 2.

## Count Twelve

### (Distributing and Dispensing Controlled Substances – 21 U.S.C. § 841)

82.     The allegations contained in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

83.     The Grand Jury further charges that, on or about February 10, 2014, in the Eastern District of Tennessee, the defendants, **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma," SYLVIA HOFSTETTER**, and **CYNTHIA CLEMONS**, and others, aided and abetted

57

by one another, did knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2.

**ENHANCED PENALTY UNDER TITLE 21,
UNITED STATES CODE, SECTION 841(b)(1)(C)**

**(Death or Serious Bodily Injury Resulting from Use of Controlled Substance)**

84.    The allegations contained in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

85.    On or about February 12, 2014, in the Eastern District of Tennessee, a person whose identity is known to the Grand Jury (S.B.) did fatally ingest and overdose on a controlled substance, namely, oxycodone, which had been distributed and dispensed, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, by defendant **CYNTHIA CLEMONS**, aided and abetted by defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **SYLVIA HOFSTETTER**, and others, to S.B. (the deceased person).

86.    As a result of the distribution and dispensation of oxycodone committed by defendant **CYNTHIA CLEMONS**, aided and abetted by defendants **LUCA SARTINI**, **LUIGI PALMA, a.k.a. "Jimmy Palma,"** and **SYLVIA HOFSTETTER**, and others, as alleged in Count Twelve, death did result from the use of a controlled substance, namely, oxycodone, a Schedule II controlled substance, all in violation of the enhanced penalty provisions of Title 21, United States Code, Section 841(b)(1)(C).

Case 3:15-cr-00027-TAV-DCP   Document 278   Filed 01/04/18   Page 58 of 68   PageID #: 4694

## Anti-kickback and Related Money Laundering Counts

87.    The allegations contained in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

## General Allegations

At all times material to this Indictment:

## The Medicare Program

88.    The Medicare Program (Medicare) was a federally funded healthcare program providing benefits to individuals that were over the age of 65 or disabled. The benefits available under Medicare were governed by federal statutes and regulations. Medicare was administered by the Centers of Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

89.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

90.    The Medicare program covered reimbursement for Drug Screenings that were provided in connection with a laboratory testing facility (Lab). Labs submitted claims for Medicare reimbursement for Drug Screenings to Medicare's Part B Trust Fund (Medicare Part B). Medicare Part B was administered in Tennessee by Cahaba GBA, which, pursuant to its contract with HHS, received, adjudicated, and paid Medicare Part B claims submitted to it by Labs for Drug Screenings.

91.    For a Lab to properly bill and be paid by Medicare for Drug Screenings, the Drug Screening must be both reasonable and medically necessary. For example, a Drug Screening is

59

medically necessary if the patient presents to a physician with a suspected drug overdose. In the context of opioid-based pain management, Drug Screening is reasonable and medically necessary if (1) a patient is suspected of diverting or not using prescribed medication as prescribed, using medication that has not been prescribed, or using illicit drugs; or (2) the Drug Screening is part of a valid protocol designed to monitor a patient's drug use (or lack thereof). Further, the patient's medical record must include documentation that fully supports the reasonableness of and medical necessity for the Drug Screening.

## Count Thirteen

### (Conspiracy to Defraud the United States, and Solicit and Receive Health Care Kickbacks from Sterling – 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)(A))

92.     The allegations contained in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

93.     From in or about August 2013, and continuing through in or about August 2015, both dates being approximate and inclusive, in the Eastern District of Tennessee, and elsewhere, the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with one another and others to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by

60

knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

94.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) soliciting and receiving kickbacks and bribes in return for causing Medicare beneficiaries to be referred to Sterling for medically unnecessary Drug Screening; (2) submitting claims to Medicare through Sterling based on bribes and kickbacks; and (3) concealing the payment of bribes and kickbacks.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

95.     Clyde Christopher Tipton, charged in another instrument, exercising his authority as owner, in whole or in part, of CHCS, influenced medical providers at CHCS to refer each and every Medicare beneficiary patient at CHCS to Sterling for medically unnecessary monthly Drug Screenings.

96.     Sterling, by and through its agents, paid so-called commission payments to the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as to Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, through Genesis, in return for causing Medicare beneficiaries to be referred to Sterling for medically unnecessary Drug Screening.

61

97.     The defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, caused Sterling to submit claims to Medicare for medically unnecessary urine testing for Medicare beneficiaries.

98.     The defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, would create false and fraudulent documentation in order to disguise the true nature of the bribes and kickbacks paid to them.

99.     In order to further conceal, from Medicare and other regulators, the payment of bribes and kickbacks, the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, created and used a shell company, to wit, Genesis, to make it appear as if Genesis performed legitimate services for Sterling.

### Anti-kickback Overt Acts

100.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Eastern District of Tennessee, at least one of the following overt acts, among others:

100.1     Between in or about August 2013 and in or about March 2015, the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others, caused the submission of approximately $1,172,747 in claims to Medicare for medically unnecessary services purportedly provided by Sterling.

100.2   On or about July 16, 2014, the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** by and through LELF, paid approximately $300,000 to Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, to buy an equity stake in Genesis and receive a percentage of the kickbacks from Sterling.

100.3   Between approximately September 22, 2014 and June 16, 2015, Genesis distributed approximately $589,195 in kickbacks received from Sterling to the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** by and through LELF.

100.4   On or about November 14, 2014, one or more coconspirators at Sterling wired $284,489.91 into the Genesis bank account ending in 5508.

100.5   On or about November 21, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $47,813.95 from Genesis, which was funded by the November 14, 2014 Sterling wire monies.

100.6    On or about November 25, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1013 for $11,500 to the LDL Investments LLC (LDL) bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

100.7   On or about November 25, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1014 for $11,500 to the MATLEO Investment LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

100.8   On or about December 15, 2014, one or more coconspirators at Sterling wired $341,716.93 into the Genesis bank account ending in 5508.

100.9   On or about December 18, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $64,450.07 from Genesis, which was funded by the December 15, 2014 Sterling wire monies.

100.10   On or about December 23, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1020 for $16,000 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

100.10 On or about December 23, 2014, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1021 for $16,000 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

100.11 On or about January 15, 2015, one or more coconspirators at Sterling wired $272,422.42 into the Genesis bank account ending in 5508.

100.12 On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $49050.00 from Genesis, which was funded by the January 15, 2015 Sterling wire monies.

100.13 On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1026 for $12,050 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

100.14 On or about January 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1024 for $12,050

to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

100.15 On or about February 13, 2015, one or more coconspirators at Sterling wired $335,761.50 into the Genesis bank account ending in 5508.

100.16 On or about February 18, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $74,604.45 from Genesis, which was funded by the February 13, 2015 Sterling wire monies.

100.17 On or about February 19, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1029 for $24,750 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

100.18 On or about February 19, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1027 for $24,750 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

100.19 On or about February 23, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, received $26,000 from Genesis, which was funded by the February 13, 2015 Sterling wire monies.

100.20 On or about February 26, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1029 for $8,500 to the LDL Investments LLC bank account ending in 2107, an account controlled by defendant **LUCA SARTINI**.

100.21 On or about February 26, 2015, the LELF bank account ending in 2215, controlled by defendant **LUCA SARTINI** and unindicted coconspirator R, issued check #1030 for $8,500 to the MATLEO LLC bank account ending in 9431, an account controlled by defendant **LUIGI PALMA, a.k.a. "Jimmy Palma."**

All in violation of Title 18, United States Code, Section 371.

## ANTI-KICKBACK CONSPIRACY FORFEITURE ALLEGATIONS

### (18 U.S.C. § 982)

101.    The allegations contained in Paragraphs 1 through 27 and 87 through 100.21 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

102.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 371, and Title 42, United States Code, Section 1320a-7b(b)(2)(A), set forth in this Indictment, the defendants, **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to the following property:

### Money Judgment

A personal money judgment in favor of the United States and against defendant **LUCA SARTINI** in the amount of $102,800, and against defendant **LUIGI PALMA, a.k.a. "Jimmy Palma,"** in the amount of $102,300, which represents the amount of proceeds each defendant personally obtained from the offenses described above.

If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence,

66

b.     has been transferred or sold to, or deposited with, a third party,

c.     has been placed beyond the jurisdiction of the court,

d.     has been substantially diminished in value, or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), and Title 18, United States Code, Section 982(b)(1).

## Count Fourteen

### (Money Laundering Conspiracy – 18 U.S.C. § 1956(h))

103.     The allegations contained in Paragraphs 1 through 27 and 87 through 100.21 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

104.     From in or about April 2014, through in or about July 2016, both dates being approximate and inclusive, in the Eastern District of Tennessee, and elsewhere, defendants **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** as well as Clyde Christopher Tipton and Maynard Alvarez, both charged in another instrument, and others known and unknown to the Grand Jury, did knowingly, intentionally, and without authority combine, conspire, confederate, and agree with one another and others to commit certain offenses against the United States, in violation of Title 18, United States Code, Sections 1956 and 1957, as follows:

a.     to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, conspiracy to violate the federal anti-kickback laws as alleged in Count Thirteen, with the intent to promote the carrying on of said specified unlawful activity, and that while

67

conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, conspiracy to violate federal anti-kickback laws as alleged in Count Thirteen, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

all in violation of Title 18, United States Code, Section 1956(h).

A TRUE BILL:

**SIGNATURE REDACTED**

FOREPERSON

J. DOUGLAS OVERBEY
UNITED STATES ATTORNEY

Tracy L. Stone
Anne-Marie Svolto
Assistant United States Attorneys
United States Department of Justice

Kelly Pearson
Trial Attorney
Organized Crime and Gang Section
United States Department of Justice

68